**WARNACO INC. and Warnaco International Inc.,**
Plaintiffs,

v.

**VF CORPORATION and Vives Vidal, S.A., a/k/a Vivesa, Defendants.**

No. 93 Civ. 4605 (RWS).

United States District Court, S.D. New York.

Feb. 7, 1994.

Milbank, Tweed, Hadley & McCloy, New York, NY (Russell E. Brooks, of counsel),

Amster, Rothstein & Ebenstein, New York, NY, for plaintiffs.

Weil, Gotshal & Manges, New York, NY (Robert G. Sugarman, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants VF Corporation ("VF") and Vives Vidal, S.A. have moved, pursuant to Rule 12(b)(6), Fed.R.Civ.P., for an order dismissing plaintiffs Warnaco Inc. and Warnaco International Inc.'s (collectively, "Warnaco") first amended complaint (the "Complaint") in its entirety as to VF and dismissing Counts II, III, IV, and V of the Complaint as to Vives Vidal, S.A. For the following reasons, the Defendants' motion is granted in part and denied in part.

### The Parties

Plaintiff Warnaco Inc. is a corporation organized and existing under the laws of the State of Delaware, having its headquarters in the City and State of New York. Plaintiff Warnaco International Inc. is a corporation organized under the laws of the State of Delaware, having an office and place of business in Bridgeport, Connecticut, and is a wholly-owned subsidiary of Warnaco Inc. Warnaco Inc. operates directly, as well as through its subsidiary Warnaco International Inc.

Defendant Vives Vidal, S.A., also known as Vivesa ("Vivesa"), is a foreign corporation organized, operating, and existing under the laws of Spain, having its principal place of business in Igualada, Spain. Vivesa is licensed to manufacture and sell Warnaco's WARNER's brand intimate apparel in Spain and Portugal, and it also manufactures and sells intimate apparel in Spain and Portugal under its own GEMMA and - INTIMA CHERRY brand names.

Defendant VF is a corporation organized, operating, and existing under the laws of the State of Pennsylvania, having an office and place of business in Wyomissing, Pennsylvania. VF is a competitor of Warnaco in the United States and throughout the world. VF manufactures, among other things, intimate apparel.

### Facts

On a motion to dismiss, all of the factual allegations in a complaint are accepted as true, *Weiss v. Wittcoff,* 966 F.2d 109, 112 (2d Cir.1992); *Ades v. Deloitte & Touche,* 1993 WL 362364 at *3, 1993 U.S.Dist. LEXIS 12901, at *7 (S.D.N.Y. Sept. 16, 1993), and all allegations must be considered in the light most favorable to the party against whom the motion is made, *Ades,* 1993 WL 362364 at *3, 1993 U.S.Dist. LEXIS 12901, at *7. The facts below, therefore, are taken from Warnaco's Complaint and Memorandum of Law in Opposition to Defendants' Motion to Dismiss, and do not represent factual findings by the Court.

Since 1874, Warnaco has used its WARNER's trademark, service mark, and trade name (the "WARNER's Trademarks") throughout the world on and in connection with its sale, both directly and through related companies and licensees, of women's intimate apparel. WARNER's brand intimate apparel is advertised worldwide by all means and types of advertising media. Warnaco claims to enjoy a favorable worldwide reputation for its merchandise, marketing, and customer service conditions. Warnaco also claims that the WARNER's Trademarks and the goodwill associated with them are of "inestimable" value to them, and that their business depends upon loyal consumers committed to basic carryover WARNER's styles.

Since 1961, Warnaco has licensed its WARNER's Trademarks to Vivesa. Most recently, Warnaco and Vivesa executed a License Agreement dated January 1, 1990, and a related Design Agreement of the same date, pursuant to which Vivesa was licensed to use certain of the WARNER's Trademarks for specified licensed products (the "Licensed Products") in the territories of Spain and Portugal. By 1991, the WARNER's business in Spain and Portugal was generating annual revenues in excess of $37 million and commanded a brand market share of over 10% in Spain. Warnaco and Vivesa had also entered into a prior license agreement dated June 1, 1988, covering the use of certain of the WARNER's Trademarks for Licensed Products in the territory of Italy (together

with the licenses issued for products in Spain and Portugal, the "Licenses").

In 1991, control of Vivesa was transferred to an investment capital firm named Mercapital, S.A. Warnaco asserts that this transfer violated the terms of the Licenses and entitled Warnaco to cancel the Licenses. Warnaco filed lawsuits in Spain and Italy to enforce its notices of termination and its rights under the Licenses (the "Lawsuits").

In 1992, Mercapital, S.A. began negotiating the sale of Vivesa to VF. In an effort to settle the Lawsuits and to facilitate VF's acquisition of Vivesa, Warnaco and Vivesa entered into the Termination Agreement which is the principal focus of this action. By letter of December 30, 1992, VIVESA informed Warnaco that "LEE BELL INC. ["Lee Bell"]—a wholly owned subsidiary of VF CORPORATION—has acquired, through an acquisition of shares of VIVESA, a majority control of the share capital of VIVESA."

By separate letter of December 30, 1992, Lee Bell, by letter from Frank Pickard, informed Warnaco that Lee Bell "underst[ood] and accept[ed] the terms and conditions of the Termination Agreement and agree[d] that it w[ould] abide by and be bound by the Termination Agreement." Warnaco claims that Frank Pickard is VF's Treasurer, and that by this letter VF, through Lee Bell, expressly agreed to be bound by the terms and conditions of the Termination Agreement.

The Termination Agreement incorporated the Licenses and expressly required those bound by it to exercise their best efforts "to maximize the promotion, sale, and delivery of Licensed Products through suitable and appropriate channels of trade" through 1993. Among other things, the Termination Agreement prohibited those bound by it from taking "any extraordinary steps to sell off [their] inventory of Licensed Products or to disrupt the orderly transition of the continued sale of such Products bearing the Trademarks by Warnaco and [their] designated representatives." It was anticipated that on January 1, 1994, Warnaco would take exclusive control of the WARNER's business.

The Termination Agreement expressly provided that in the event of a dispute between or among the parties, it would "be governed by and construed in accordance with the laws of the State of New York." It further provided that "any dispute or issue arising hereunder, including any alleged breach by VIVESA," would be litigated in the federal courts in New York City "which the parties hereby agree shall have proper jurisdiction over the issues and the parties." Further, the Termination Agreement states that "VIVESA hereby agrees to submit itself to the jurisdiction of the federal courts in New York and waives the right to make any objection based on jurisdiction or venue."

Warnaco claims that the Defendants conspired and acted to destroy the WARNER's business in Spain and Portugal by willfully breaching the Termination Agreement for the purpose of weakening Warnaco's business in Spain and Portugal to reduce the competition with the Defendants' GEMMA and INTIMA CHERRY brands of intimate apparel.

Warnaco alleges that the Defendants failed to use their best efforts to promote, manufacture, and sell WARNER's products in Spain and Portugal and by taking affirmative steps to disparage and weaken the WARNER's Trademarks. Specifically, Warnaco alleges that the Defendants failed to continue Vivesa's historical practice of introducing new WARNER's styles into the marketplace, thereby creating a false impression that the WARNER's brand was leaving the marketplace; that they failed to print a 1993 catalogue promoting WARNER's brand products and instead merely reprinted the 1992 catalogue; that they intentionally ceased to manufacture and maintain an inventory of basic carryover styles; that they took extraordinary steps to sell off WARNER's inventory and wilfully disrupted the marketplace and the orderly transition of the business of selling WARNER's Licensed Products. Warnaco claims that the Defendants' actions have created confusion among customers and consumers in the marketplace in Spain and Portugal as to the source of intimate apparel and as to the current and future availability of WARNER's brand products.

In addition, Warnaco alleges that Defendants willfully caused WARNER's Licensed Products to be marked down and closed out at distress prices in a manner adversely impacting the reputation and value of the WARNER's Trademarks; that they subsidized retailers to sell WARNER's Licensed Products at discounts in excess of 30%; and that these subsidies and discounts, along with the lack of inventory of WARNER's Licensed Products have eroded the value and good will of WARNER's Trademarks.

Warnaco alleges that in February 1993, Defendants told buyers from major department stores and other retail accounts where WARNER's products previously had been sold that WARNER's products were being discontinued and replaced with Defendants' own GEMMA and INTIMA CHERRY brand intimate apparel products, and that Defendants have wilfully failed to make available to customers at least ten of the twenty-five top selling WARNER's styles.

Warnaco further alleges that Defendants have copied the colors and design of several of the best selling WARNER's styles and have been selling these products under their own GEMMA and INTIMA CHERRY labels, and that they placed on their brands of intimate apparel items hang tags and labels of the same color, lettering, size, and typeface as the WARNER's hand tags, and packaged GEMMA and INTIMA CHERRY products in the same boxes as WARNER's intimate apparel, even though GEMMA and INTIMA CHERRY products previously had hang tags and packaging that was of a different color and design.

As a result of the Defendants' actions, Warnaco alleges that Vivesa's sales of WARNER's products have declined from $9,232,000 in the first quarter of 1992 to $2,893,000 in the first quarter of 1993; that Vivesa's sales of WARNER's Licensed Products for the second quarter of 1993 were only $1,462,250, compared with sales in the second quarter of 1992 of approximately $8,336,706, and the second quarter of 1991 of approximately $9,629,223, reflecting declines of approximately 82% and 85%, respectively, over the two comparable prior periods.

### Prior Proceedings

Warnaco filed its complaint in this matter on July 8, 1993, and filed its First Amended Complaint on September 13, 1993. Argument was heard on the present motion to dismiss the First Amended Complaint on September 22, 1993. By letter of January 27, 1994, the attorneys for Warnaco supplied the Court with a copy of a letter, dated December 30, 1990, from Pedro Prat of Vivesa to Warnaco, and a copy of a letter, dated December 30, 1992, from Frank Pickard of Lee Bell to Warnaco. These motions were considered fully submitted as of January 28, 1994.

### Discussion

### Standards for Dismissal Under Rule 12(b)(6)

Defendants' motion is brought pursuant to Rule 12(b)(6), the proper ground for which is failure to state a claim upon which relief can be granted. Defendants' memorandum, however, combines and confuses arguments addressed to subject matter jurisdiction, personal jurisdiction, and venue. Such arguments are properly the subject of motions under Rules 12(b)(1), (2), or (3), respectively. Defendants' Memorandum also attacks the substance of the claims alleged in the Complaint, which arguments are properly considered under Rule 12(b)(6). The Court will attempt to unravel these arguments below.

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985); *Morin v. Trupin,* 835 F.Supp. 126, 129 (S.D.N.Y.1993); *Aquino v. Trupin,* 833 F.Supp. 336, 340 (S.D.N.Y.1993).

A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *accord H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249, 109 S.Ct. 2893, 2905, 106 L.Ed.2d 195 (1989); *Hishon v. King &*

*Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Morin,* 835 F.Supp. at 129; *Aquino,* 833 F.Supp. at 340. In ruling on a motion to dismiss, "the court simply determines [the complaint's] legal viability." *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

### The Court Assumes for Purposes of This Motion that VF is Bound by the Terms of the Termination Agreement

◼ A parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract. This intent can be inferred from the parent's participation in the negotiation of the contract. *AB v. ICC Indus., Inc.,* 1991 WL 161367 at *1, 1991 U.S.Dist. LEXIS 11485, at *4 (S.D.N.Y. Aug. 16, 1991) (denying defendants' motion that it was not proper party to suit and allowing plaintiff to develop facts necessary to prove this theory of liability against parent corporation). A parent corporation that negotiates a contract but has a subsidiary sign it can be held liable as a party to the contract, if the subsidiary is a dummy for the parent corporation. *A.W. Fiur Co. v. Ataka & Co.,* 71 A.D.2d 370, 422 N.Y.S.2d 419, 422 (1st Dep't 1979).

◼ Moreover, a parent company may be liable on a contract signed by its subsidiary if the subsidiary is shown to be a mere shell dominated and controlled by the parent for the parent's own purposes. In *In re Sbarro Holding, Inc.,* 91 A.D.2d 613, 456 N.Y.S.2d 416 (2d Dep't 1982), a holding company sought to stay an arbitration proceeding against it and other related corporations on the ground that the agreement that called for arbitration was between a franchisee and its subsidiary. The court held that all the related corporations could be compelled to participate in the arbitration proceeding, although they were not signatories of the contract. The court explained that:

> The corporate veil will be pierced (1) to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation and act as the true prime movers behind the subsidiary's actions, and/or (2) where a

parent corporation conducts business through a subsidiary which exists solely to serve the parent.

*Sbarro,* 456 N.Y.S.2d at 417 (citations omitted).

◼ The Defendants assert that its subsidiary Lee Bell, and not VF, executed the Termination Agreement, and that Warnaco must look to Lee Bell for relief. The Complaint alleges that VF intended to be a party to the Termination Agreement, stating that "[i]n late 1992, when the sale of Vivesa to VF became imminent, Vivesa, acting for and on behalf of VF, approached Warnaco in an effort to settle the Lawsuits so that Defendants could complete the steps necessary to conclude the acquisition of Vivesa by VF, a competitor of Warnaco." The Termination Agreement expressly states that "WARNACO acknowledges the existence of the negotiations with VF for the transfer of all or part of the capital stock of VIVESA; and ... accepts the result of such negotiations with VF...."

The Complaint alleges that Lee Bell was a wholly owned subsidiary and agent of VF, and existed solely as an acquisition vehicle for VF to acquire Vivesa. The Complaint further alleges that Frank Pickard, VF's Treasurer, acted for Lee Bell in connection with the acquisition of Vivesa, and that VF actually acquired Vivesa through Lee Bell. By express agreement of Frank Pickard, Lee Bell accepted and agreed to be bound by the terms and conditions of the Termination Agreement. Warnaco asserts that the only reason that Lee Bell was required to expressly agree to the terms of the Termination Agreement was to bind VF.

The factual allegations of the Complaint sufficiently allege that the negotiations leading up to the signing of the Termination Agreement indicate an intent by VF to be bound by it. Additionally, they sufficiently allege that Lee Bell was a mere shell dominated and controlled by VF to accomplish VF's own purpose of acquiring Vivesa.

The Defendants concede that Claim I of the Complaint alleges a breach of the Termination Agreement and, pursuant to forum selection clause in the Termination Agree-

ment, this claim, as alleged against Vivesa, is properly before this Court. Since we assume for purposes of this motion that VF is also bound by the Termination Agreement, the Defendants' motion to deny Count I of the Complaint as against VF is denied.

### Claims II through V of the Complaint "Arise Under" the Termination Agreement

■ Clause 5 of the Termination Agreement provides:

> Any dispute or issue arising hereunder, including any alleged breach by VIVESA ... shall be heard, determined and resolved by an action commenced in the federal courts in New York City, New York, which the parties hereby agree shall have proper jurisdiction over the issues and the parties. VIVESA hereby agrees to submit itself to the jurisdiction of the federal courts in New York and waives the right to make any objection based on jurisdiction or venue.

The Second Circuit has held that forum selection clauses enjoy a presumption of validity where the underlying transaction is fundamentally international in character. This is because:

> American parochialism would hinder the expansion of American business and trade, and more generally, interfere with the smooth functioning and growth of global commerce. Forum selection and choice of law clauses eliminate uncertainty in international commerce and insure that the parties are not unexpectedly subjected to hostile forums and laws. Moreover, international comity dictates that American courts enforce these sorts of clauses out of respect for the integrity and competence of foreign tribunals. In addition to these rationales for the presumptive validity of forum selection and choice of law clauses, the [Supreme] Court has noted that contracts entered into freely generally should be enforced because the financial effect of forum selection and choice of law clauses likely will be reflected in the value of the contract as a whole.

*Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1362–63 (2d Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993).

The Circuit Court has also noted the "strong public policy in favor of forum selection ... clauses." *Id.* at 1361. In support of this policy, courts have read contractual forum selection clauses to encompass claims beyond breach of the contract containing the clause. *See id.* ("We ... reject the ... contention that only allegations of contractual violations fall within the scope of the [forum selection] clauses.").

*Roby* involved a suit by investors in alleged securities in Great Britain. The investors alleged loss from violations of United States securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The investors had signed agreements governing their rights and duties vis-a-vis the marketers of the of the alleged securities, and these agreements contained forum selection clauses in favor of England for claims for "all purposes of and in connection with the agreements." The plaintiffs did not allege any breach of contract claims, and they therefore argued that the forum selection clauses were not broad enough to cover their claims under the securities laws. *Roby*, 996 F.2d at 1361–62.

The Second Circuit held that the duties of the marketer of the securities was integrally related to the sale of the securities, and that the agreements were a prerequisite to investing in the securities. Since the responsibilities governed by the agreements related to the sale of securities, the Circuit Court held that the plaintiffs' Securities Act claims "related to" the agreements, and were thus governed by the forum selection clauses. *Id.* at 1361.

The Second Circuit reached this conclusion, in part, on the basis of the Supreme Court decision in *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). In *Scherk*, Alberto–Culver had sued Scherk in federal district court for violations of United States securities laws. Alberto–Culver, an American manufacturer, had purchased certain enterprises from Scherk, a German citizen, together with all trademark rights in the enterprises. The sales contract contained express warranties by Scherk that the trademarks were unen-

cumbered. In addition, the contract contained a clause providing that "any controversy or claim [that] shall arise out of this agreement or the breach thereof" would be settled by arbitration to be conducted in Paris, France.

After allegedly discovering that the trademarks were subject to substantial encumbrances, the respondent brought suit in United States District Court, contending that Scherk's fraudulent representations concerning the trademark rights violated United States securities laws. The Alberto–Culver argued that its agreement to arbitrate disputes arising under the contract did not apply to its contentions that the petitioner had violated the securities laws.

The Court enforced the forum selection clause, stating that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk*, 417 U.S. at 506, 94 S.Ct. at 2449; *see also Bense v. Interstate Battery Sys., Inc.*, 683 F.2d 718 (2d Cir.1982) (forum selection clause relating to any action "arising directly or indirectly from" franchise agreement includes both breach of contract claims and allegations of violations of Sherman Antitrust Act).

*Crescent International, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943 (3d Cir. 1988), involved the validity and interpretation of a forum selection clause in an agreement under which the appellant sold Florida real estate owned by the appellee Avatar, a Florida corporation, in return for commissions. The agreement provided that "any litigation upon any of [the agreement's] terms ... shall be maintained" in a state or federal court in Miami, Florida. The appellant nevertheless filed an action in the United States District Court for the Eastern District of Pennsylvania, alleging breach of the contract and related claims based on RICO, misrepresentations, unfair competition, conversion, fraud and tortious interference with business relationships.

The appellant argued that the forum selection clause was so narrowly drafted that it did not apply to its claims of RICO violation, fraud, unfair competition and tortious interference. The Third Circuit held that, although only one of the appellant's claims was based on a breach of contract theory, pleading alternate non-contractual theories is not enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms. *Crescent Int'l, Inc.*, 857 F.2d at 944.

Finally, in *YWCA v. HMC Entertainment, Inc.*, 1992 WL 279361, 1992 U.S.Dist. LEXIS 14713 (S.D.N.Y. Sept. 25, 1992), the plaintiff and defendant had entered into a contract according to which defendant was to develop and produce a televised award program. Pursuant to the contract, plaintiff granted defendant a license to use plaintiff's trademarks in connection with the program. The contract included the following choice-of-law and choice-of-forum provisions:

> This agreement shall be governed by California law. The parties agree that any litigation arising under this agreement shall be commenced in the Federal District Courts in California.

The contract expired before the program went into production and the plaintiff entered into negotiations with a different company to produce a similar television program. The plaintiffs then brought an action in this Court seeking a declaratory judgment that any televised program that plaintiff might sponsor would not give rise to claims of unfair competition under the Lanham Act, common law trademark infringement, common law unfair competition, misappropriation, or breach of an implied contract.

The plaintiff claimed that the forum-selection clause was irrelevant because the action did not include any claim for breach of contract. Citing *Bense*, this Court held that the plaintiff's claims "arose under" the contract since they involved rights arising out of the contract and since the plaintiff's entire business relation with defendant stemmed from the contract.

Under the Termination Agreement, Vivesa was required to implement and exercise quality control requirements and exercise its best efforts to maximize the promotion, sale, and delivery of Licensed Products through suit-

able and appropriate channels of trade and the correct use of the Trademarks on all Licensed Products, and to cooperate with Warnaco in effecting an orderly transition of business and accounts for the Licensed Products. Further, Vivesa was not to take extraordinary steps to sell off its inventory of Licensed Products or to disrupt the orderly transition of the continued sale of the Products.

Claims II through V of the Complaint are predicated upon the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1051 *et seq.;* common law unfair competition; violations of N.Y.Gen.Bus.Law § 368–d, and prima facie tort. These claims allege, *inter alia,* that the Defendants copied the style and packaging of Warnaco products, misrepresented the nature, characteristics, and qualities of goods under the WARNER's Trademarks, degraded and disparaged the WARNER's Trademarks, failed to use their best efforts to continue and manufacture and market the Licensed Products as required by the Termination Agreement, wilfully allowed inventories of WARNER's Licensed Products to be depleted and not replenished, substituted their own products for the Licensed Products, subsidized markdowns and sell-offs of WARNER's Licensed Products at distress prices and in a manner that reflects adversely on the reputation of the WARNER's Trademarks, and willfully eroded the value of WARNER's Trademarks.

The Defendants argue that Claims II through V do not arise under the Termination Agreement because they could be brought regardless of whether or not the Termination Agreement existed. As an initial matter, the express terms of the Termination Agreement belie the claim that the forum selection clause was limited to claims for breach of the Agreement. The forum selection clause applies to "[a]ny dispute or issue ... *including any alleged breach by Vivesa* " (emphasis added). To hold that this clause applied only to breaches of the agreement would contradict the plain words agreed to by the parties to the Termination Agreement.

In addition, absent the Termination Agreement, pursuant to which the Defendants held, advertised, and marketed the Products, the Defendants would have been unable, or would have found it much more difficult, to engage in the alleged wrongful behavior. The Complaint implies that Vivesa's long-standing position as representative of the Licensed Products, a position sustained through the Termination Agreement, gave the Defendants a peculiar ability to communicate with purchasers of the Licensed Products, to suggest product substitutions, and to introduce the copies into commerce.

As was true of the claims discussed in *YMCA* and the other cases cited above, Claims II through V arise under the Termination Agreement since they involved rights and duties arising out of the Termination Agreement, the plaintiff's entire business relation with defendant stemmed from the Termination Agreement, and the alleged conduct was made possible only or principally because of the Termination Agreement.

The cases cited by the Defendants are not to the contrary. In *General Environmental Science Corp. v. Horsfall,* 753 F.Supp. 664 (N.D.Ohio 1990), the plaintiffs claimed violations of RICO, state statutes, and state common law, but made no contractual claims. The claims asserted in that case were wholly unrelated to the distributorship agreement entered into between the parties, and the court therefore treated them as arising out of the ongoing business relationship between the parties, rather than under the contract. *Karlberg European Tanspa, Inc. v. JK–Josef Kratz Vertriebsgeselischaft Mbh,* 699 F.Supp. 669 (N.D.Ill.1988), also did not involve a breach of contract claim. The court in *Karlberg* noted that ordinarily, when breach of contract claims are brought together with other ancillary claims, all claims are covered by the forum selection clause. Indeed, in an earlier suit between the same parties that did involve a breach of contract claim, the judge enforced the forum selection clause at issue in *Karlberg. Karlberg European Tanspa, Inc.,* 699 F.Supp. at 670.

*Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.,* 890 F.2d 165 (9th Cir.1989), rather than involving a forum selection clause, concerned a choice of law clause which by its own terms was limited to the

950

construction or interpretation of the franchise agreement in which it was contained, and did not apply to claims arising under the agreement.

Since Claims II through V arise under the Termination Agreement, and since for purposes of this motion we hold that VF is bound by the Termination Agreement, the Defendants' motions to dismiss Claims II through V for lack of personal jurisdiction or venue are denied.

■ In addition, this Court has subject matter jurisdiction over this entire dispute.[1] In *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), the complaint asserted federal jurisdiction because the dispute raised a federal question under the Lanham Act and because of the presence of diversity of citizenship and the requisite jurisdictional amount. The defendants in *Vanity Fair* argued that the court lacked subject matter jurisdiction over the trademark infringement claims and unfair competition claims because the wrongful conduct occurred in a foreign country.

The Second Circuit held that the district court had subject matter jurisdiction over the entire action, explaining that "[r]egardless of the existence of the other asserted grounds for federal jurisdiction, the allegations of diversity of citizenship and the requisite jurisdictional amount were sufficient to vest the district court with jurisdiction over the entire action." *Vanity Fair,* 234 F.2d at 638.

In the present case, there is complete diversity between Warnaco and the Defendants. In addition, the sum in controversy in this matter exceeds $50,000. *See* 28 U.S.C. § 1332. Accordingly, this Court has subject matter jurisdiction over all of Warnaco's claims.

### Claim II States a Valid Claim for Relief

Claim II of the Complaint alleges violations of the Lanham Act, which regulates trademark use and protection and applies to "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. It is

beyond dispute that the Lanham Act may be applied to conduct outside of the United States. *See, e.g., Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (applying Lanham Act to activities in Mexico).

■ The existence of subject matter jurisdiction over this matter does not automatically dictate that all of Warnaco's claims should be heard in this Court. *See American White Cross Labs., Inc. v. H.M. Cote, Inc.,* 556 F.Supp. 753, 757 (S.D.N.Y.1983). In *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 641–42 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), the Second Circuit enunciated the factors to be considered in determining Lanham Act jurisdiction over corporations engaging in conduct outside the United States: (1) whether the defendant's conduct has a substantial effect on United States commerce; (2) whether the defendant is a citizen of the United States; and (3) whether there exists a conflict with trademark rights under foreign law. *Vanity Fair Mills,* 234 F.2d at 642. None of these three criteria is dispositive of the analysis concerning the Lanham Act's extraterritorial effect, and a court must employ a balancing test of all three factors to determine whether the statute is properly implicated. *See Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.,* 714 F.Supp. 78, 80 (S.D.N.Y.1989). The object of this balancing test is to determine whether the "contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction." *King v. Allied Vision, Ltd.,* 807 F.Supp. 300, 306–07 (S.D.N.Y.) (quoting *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n,* 701 F.2d 408, 412 n. 5 (5th Cir.1983)), *aff'd in part and rev'd in part on other grounds,* 976 F.2d 824 (2d Cir.1992).

■ With regard to the first *Vanity Fair* factor, substantial impact on United States commerce, Warnaco asserts that, as a result of the Defendants' allegedly wrongful conduct, it has suffered and continues to suffer damage to its Trademarks, business reputa-

---

1. Parties cannot create subject matter jurisdiction through a contractual forum selection clause. *Hoffman v. Blaski,* 363 U.S. 335, 342– 43, 80 S.Ct. 1084, 1088–90, 4 L.Ed.2d 1254 (1960).

tion, and good will, as well as diversion of trade, consumer loyalty, and loss of profits due to confusion of customers in the marketplace.

Warnaco is a Delaware corporation whose shares are traded on the New York Stock Exchange, with a substantial market in the United States. VF is also an American corporation, and a major competitor of Warnaco. Although many of the acts complained of have taken place in Spain and Portugal, Warnaco asserts that the harm to its reputation and goodwill will have a substantial impact on United States commerce and on the competitive relationship between Warnaco and VF.

The Defendants use of the WARNER's Trademarks and the conduct that underlies the Lanham Act allegations was pursuant to the License and Termination Agreements, which are governed by New York Law. The Termination Agreement was negotiated in New York. Also, Warnaco supervises and controls its licensees from its New York offices, receiving samples for quality control evaluation in New York and receiving and or processing royalty statements under the Agreements in New York.

The Lanham Act recognizes that a substantial effect on commerce may arise from harm to a plaintiff's reputation. In *King v. Allied Vision, Ltd.*, 807 F.Supp. 300 (S.D.N.Y.), *aff'd in part and rev'd in part on other grounds*, 976 F.2d 824 (2d Cir.1992), a case brought under the Lanham Act, the court enjoined a British defendant from exhibiting a motion picture anywhere in the world, based on a claim that the film falsely represented the plaintiff's involvement in the film. This Court stated that:

> Extraterritorial jurisdiction is appropriate in the present case because plaintiff has the exclusive right to his name throughout the world and his reputation will be irreparably harmed abroad by defendants' false representations in the foreign distribution of the film.

*King,* 807 F.Supp. at 307.

In *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n,* 701 F.2d 408, 414–15 (5th Cir.1983), the Fifth Circuit, in a case

brought under the Lanham Act, held that, by selling products under infringing marks in Saudi Arabia, defendant diverted sales from the plaintiff. The court held that there was no requirement that the products make their way back into the United States.

In *Calvin Klein Industries, Inc. v. BFK Hong Kong, Ltd.,* 714 F.Supp. 78 (S.D.N.Y. 1989), the plaintiff had entered into a manufacturing contract with the defendants. Because of a delay, the plaintiff refused to accept the merchandise, which remained outside the United States. The plaintiff sought an injunction prohibiting the defendants from trying to sell these garments anywhere, including outside the United States. This Court addressed the issue of whether it could enjoin the sale of such garments abroad. In applying the three *Vanity Fair* factors, the Court found that:

> Calvin Klein is entitled to injunctive relief against infringing sales where such sales would divert Calvin Klein's sales, or would harm licensees.... Calvin Klein claims that, because of its worldwide advertising and use of authorized licensees, any sale of the garments will irreparably damage Calvin Klein directly, by undermining Calvin Klein's good will and reputation for quality manufacture, or indirectly, by depriving Calvin Klein licensees of their exclusive rights. Such injuries would have a substantial effect on United States commerce, and, therefore, are enjoinable under the Lanham Act.

*Calvin Klein,* 714 F.Supp. at 80; *see also Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (applying Lanham Act to infringing sales in Mexico, in part, because of adverse reflection on plaintiff's reputation in the United States and elsewhere); *Philip Morris, Inc. v. MidWest Tobacco, Inc.,* 1988 WL 150693 at *3–4 1988 U.S.Dist. LEXIS 16787, at *9 (E.D.Va. Nov. 4, 1988) (extending application of Lanham act abroad because sales of defendant's products there were expected to diminish plaintiff's export sales and diminish revenues from sales and licensing).

 It is not necessary to allege that the infringing goods are of inferior quality for the Lanham Act to apply extraterritorially;

diversion of sales and adverse impact on foreign licensees can constitute substantial impact on United States commerce. *See Tanning Research Lab., Inc. v. Worldwide Import & Export Corp.*, 803 F.Supp. 606, 609 (S.D.N.Y.1992) (not necessary to allege that goods were inferior to state claim under Lanham Act).

The first *Vanity Fair* factor, therefore, argues for the application of the Lanham Act in this case. Accepting the factual allegations in the Complaint as true, the Defendants' infringing activities have diverted sales from Warnaco and have caused confusion among consumers, with adverse impacts on Warnaco's income, reputation, and licensees. These impacts adversely affect Warnaco's competitive position with VF, a large rival in the United States market. The relationships between the parties are regulated by agreements that are governed by New York law, and Warnaco's relationships with its licensees is directed from New York. These allegations indicate that the Defendants' alleged activities affect United States commerce.

With regard to the second *Vanity Fair* factor, the existence of an American defendant, VF is an American corporation, and Vivesa is allegedly its wholly-owned subsidiary. The complaint alleges that VF controls the business activities of Vivesa and has purposefully directed Vivesa's policy as part of a strategy to destroy Warnaco as a competitor. These allegations must be accepted as true for purposes of this motion. At a minimum, there are issues of fact concerning VF's participation in and control of the acts complained of by Warnaco. Also, even though Vivesa is a Spanish corporation, they have agreed in the Termination Agreement to the adjudication of claims arising under that Agreement in the federal courts in New York. The fact that Vivesa has agreed that it must defend against Warnaco's first claim for breach of contract in this Court lessens any burden that might normally be imposed by requiring a foreign entity to litigate here. These considerations weigh in favor of application of the Lanham Act under the second *Vanity Fair* factor.

The third *Vanity Fair*, conflict with trademark rights under foreign law, does not prevent the application of the Lanham Act in the present case. In *Vanity Fair*, the court concluded that "the Lanham Act ... should not be given an extraterritorial application against foreign citizens acting under presumably valid trade-marks in a foreign country." *Vanity Fair*, 234 F.2d at 643. The court refused to enforce the plaintiff's United States trademark registrations in Canada because the defendants owned a presumptively valid Canadian registration for the same trademark. To have applied the Lanham Act in this context would have impermissibly interfered with the laws of a foreign country. *See also American White Cross Lab., Inc. v. H.M. Cote, Inc.*, 556 F.Supp. 753, 757–58 (S.D.N.Y.1983) (stressing that Canadian defendants had applied to register the trademark in issue, therefore potential conflict with foreign trademark rights existed).

In the present case, the foreign trademark registration at issue is owned exclusively by Warnaco. The Defendants have no valid trademark rights with respect to the WARNER's name in Spain or Portugal, except through the Licenses and the Termination Agreement. This court's adjudication of an action related to the Termination Agreement and Warnaco's trademark rights, therefore, would not interfere with the laws of Spain or Portugal. Likewise, since the Defendants do not have a registration under Spanish or Portuguese law, Spain and Portugal do not have an interest in this litigation that conflicts with application of the Lanham Act.

After balancing of the three *Vanity Fair* factors, the contacts and interests of the United States are sufficient to support the exercise of extraterritorial application of the Lanham Act in this case. In addition, as concluded above, the contract action in any event would remain here for disposition. The interests of justice in a speedy and complete disposition of the dispute between the parties is an appropriate factor placing additional weight in favor of the retention of Lanham Act jurisdiction. The Defendants' motion to dismiss Count II of the Complaint against VF and Vivesa is therefore denied.

### Claim III States a Valid Claim for Relief

██ Claim III of the Complaint alleges unfair competition under the common law of New York predicated upon the same conduct as that underlying the Lanham Act claim. The Defendants claim that, since the alleged unfair competition occurred largely in Spain and Portugal, Warnaco's unfair competition claim should be dismissed.

██ New York allows for businesses to provide in a contract that New York law will apply, regardless of the domicile of the parties and regardless of where the contract may be performed, where a contract is for more than $250,000. N.Y.Gen.Oblig.L. § 5–1401. Where a contract is for more than $250,000 and contains a clause designating New York law as controlling, "N.Y.Gen. Oblig.Law § 5–1401 mandates the enforcement of that choice of law provision." *Bank of Am. Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A.,* 740 F.Supp. 260, 265 (S.D.N.Y.), *aff'd,* 923 F.2d 843 (2d Cir.1990).

In this case, the Clause 1(a) of the Termination agreement required Defendants to pay Warnaco $2.5 million as consideration for termination of the license agreements and $500,000 to satisfy royalty obligations. Therefore, the Termination Agreement is a contract for more than $250,000. Clause 5 of the Termination Agreement directs that the Termination Agreement is to be governed by and construed in accordance with the laws of the State of New York. N.Y.Gen.Oblig.L. § 5–1401, therefore, mandates that New York, rather than Spanish or Portuguese law should apply to Warnaco's unfair competition claims.

The cases cited by the Defendants are inapposite, since none of them involved contractual choice of law provisions. *See Totalplan Corp. v. Lure Camera Ltd.,* 1993 WL 117504, 1993 U.S.Dist. LEXIS 5100 (W.D.N.Y. Apr. 12, 1993); *C.A. Westel de Venezuela v. A T & T Co.,* 1992 WL 209641, 1992 U.S.Dist. LEXIS 12301 (S.D.N.Y. Aug. 17, 1992); *American White Cross Lab. Inc. v. H.M. Cote, Inc.,* 556 F.Supp. 753 (S.D.N.Y. 1983); *C–Cure Chemical Co. v. Secure Adhesives Corp.,* 571 F.Supp. 808, 820–21 (W.D.N.Y.1983).

It is true that some courts have indicated that N.Y.Gen.Oblig.L. § 5–1401 will not control if the forum state has insufficient contacts with the transaction at issue. *See In re Joint E. & S. Dists. Asbestos Litig.,* 129 B.R. 710, 886 (E.D.N.Y.1991). In this case, however, the considerations supporting the application of the Lanham Act because of the Defendants' activities alleged affect on United States commerce also support the application of New York's unfair competition law, since Warnaco's headquarters are in New York and it conducts substantial business in New York.

Because of the Defendants' consent to the application of New York law in the Termination Agreement, as well as New York's interest in and contacts with this litigation, Defendants' motion to dismiss Claim III of the Complaint as to VF and Vivesa is denied.

### Claim IV States a Valid Claim for Relief

Claim IV of the Complaint alleges violations of N.Y.Gen.Bus.L. § 368–d, predicated upon the same allegations as those underlying Claims II and III. Section 368–d provides that:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

The Defendants first attack this claim on the basis of the same arguments lodged against Claims II and III: that the Complaint does not allege sufficient contact with commerce in New York for this claim to stand, and that Warnaco must seek relief under the laws of Spain or Portugal. This argument is rejected for the same reasons it was rejected above: the choice of law clause mandates the application of New York law to disputes arising out of the Termination Agreement, and the activities alleged in the Complaint are sufficiently related to commerce in New York to make the application of New York law appropriate.

■ The Defendants also argue that Warnaco has failed to state a claim of dilution under § 368–d, since the term "dilution" in the statute refers only to the unauthorized placement of an established trademark on dissimilar products.

Regardless of the merits of the Defendants' description of a claim of dilution, their argument ignores the fact that § 368–d provides relief in the disjunctive for dilution *or* likelihood of injury to business reputation. In *Clairol Inc. v. L.H. Martin Value Center, Inc.,* 40 Misc.2d 875, 244 N.Y.S.2d 210 (N.Y.Sup.Ct.1963), the New York Supreme Court held that a retailer's sale of the manufacturer plaintiff's hair color bath unaccompanied by certain required information violated § 368–d, since this could damage the plaintiff's business reputation. The plaintiff did not allege trademark dilution. *See also Abou–Khadra v. Mahshie,* 4 F.3d 1071 (2d Cir.1993) (considering counterclaim under § 368–d for injury to business reputation caused by the misrepresentation of financial interests of counterclaimant).

Section 368–d provides a cause of action for likelihood of injury to business reputation, regardless of whether trademark dilution is alleged. Warnaco's allegations that the Defendants' activities have disparaged and diminished the value of Warnaco's WARNER's Trademarks, thereby injuring the business reputation and goodwill inherent in the Trademarks, state a claim under § 368–d. Defendants' motion to dismiss Claim IV of the Complaint as against VF and Vivesa is therefore denied.

### Claim V of the Complaint Fails to State a Valid Claim for Relief

■ Claim V of the Complaint is based on the same factual allegations as the previous claims, and alleges a cause of action under New York law for prima facie tort. Prima facie tort provides a remedy for damages caused by the intentional infliction of harm, without excuse or justification, by an act or series of acts which would otherwise be lawful. *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 142, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985); *Bassim v. Howlett,* 191 A.D.2d 760, 594 N.Y.S.2d 381 (1993).

■ In order to properly plead a cause of action for prima facie tort, it is necessary to allege that the actions complained of were motivated solely by malice or "disinterested malevolence." *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 468 (1983). In other words, "the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to the injury and damage of another." *Id.* (quoting *Beardsley v. Kilmer,* 236 N.Y. 80, 90, 140 N.E. 203 (1923)). "[T]he sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff. When there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of prima facie tort." *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985).

■ In the present case, the thrust of the Complaint is that the Defendants were motivated by a desire to profit at the plaintiffs' expense. Warnaco accuses the Defendants of "[the] active and intentional replacement of WARNER's products with those of the Defendants in the marketplace" (Complaint ¶ 24); and "substitut[ing] and promot[ing] their own products, primarily GEMMA and INTIMA CHERRY in place of WARNER's" (Complaint ¶ 27).

Assuming, as we must for purposes of this motion, that these allegations are true, it is clear that the Defendants' did not have the "disinterested malevolence," devoid of profit motives, that is necessary for Warnaco to state a claim for prima facie tort. Claim V of the Complaint, alleging prima facie tort, is therefore dismissed.

### Conclusion

For the foregoing reasons, the Defendants' motion to dismiss is granted in part and denied in part.

It is so ordered.