**Stephen KING, Plaintiff,**

v.

**ALLIED VISION, LTD., New Line Cinema Corporation and Innovative Books, a Division of the Innovative Corporation, Defendants.**

**No. 92 Civ. 3852 (CBM).**

United States District Court,
S.D. New York.

July 2, 1992.

Affirmed in part and reversed in part, 976 F.2d 824.

Peter Herbert, Cowan, Liebowitz & Latman, P.C., New York City, for plaintiff.

Wesley G. Howell, Gibson, Dunn & Crutcher, New York City, for defendant Allied Vision, Ltd.

Joseph J. Santora, Santora & Allen, New York City, for defendant New Line Cinema Corp.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

MOTLEY, District Judge.

## I. INTRODUCTION

In this application for a preliminary injunction, plaintiff seeks to enjoin defendants from using plaintiff's name in a possessory or "based upon" credit in connection with the movie "The Lawnmower Man". Plaintiff bases his claim for relief on the Lanham Act and similar claims under New York state law, and argues that the movie bears no likeness to the short story which he authored and published under the same name.

This case first came before the court in a hearing on plaintiff's application for a temporary restraining order on June 16, 1992. At that time, the court, having read the short story upon which the film was purportedly based, viewed the film in question and heard argument on plaintiff's application. The court denied the relief requested on the ground that plaintiff's delay in seeking a temporary restraining order undermined his claim that he required immediate relief, and on the ground that plaintiff had failed to establish that further irreparable harm would result between then and the date of the preliminary injunction hearing which had been previously scheduled for June 29, 1992. At the same time, the court ruled that the trial would be consolidated with the preliminary injunction hearing under Rule 65(2) of the Federal Rules of Civil Procedure, since it appeared that the case did not involve many witnesses and could be completed in one or two trial days.

The trial began on June 30, 1992, the court having granted the parties' request to delay the trial one day to engage in settlement negotiations. The court now finds that the trial has proven to be more extensive than it initially appeared it would be. However, the court has heard enough of the case to permit a preliminary injunction to issue at this time, pending the remainder of the trial, as plaintiff has sustained his burden of proving the elements necessary to obtain preliminary relief.

## II. FINDINGS OF FACT

After hearing the evidence and weighing the testimony and exhibits received in evidence, the court now makes the following preliminary findings of fact.

1. The short story titled "The Lawnmower Man" and authored by the now famous Stephen King on or about 1975 is published in a collection of short stories by the same author titled "Nightshift". At the time of its publication, plaintiff was not well-known; today his reputation is worldwide.

2. The film titled "The Lawnmower Man" is produced by defendant Allied Vision, Ltd. ("Allied") and distributed domestically by defendant New Line Cinema Corporation ("New Line"). Both plaintiff and New Line are United States citizens. Allied is a citizen of Great Britain.

3. Allied contracted through its agent in the United States, August Entertainment, Inc. ("August"), for all foreign distribution of the film. The foreign distribution agreements between Allied and August are governed by California law and provide for payment in United States currency. Allied applied the false attribution to the film in the United States. Allied's use of plaintiff's name in connection with the foreign distribution of the film substantially affects United States commerce.

4. In the film's advertising and promotional materials, and in the beginning of the film itself, the film is prominently identified as "Stephen King's 'The Lawnmower Man'". The film is also advertised and promoted as "based upon" a short story by Stephen King. Plaintiff's name is prominently used in connection with the film in other ways, as well. For example, some previews and advertisements introduce the movie as "from the mind of Stephen King", or "from the imagination of Stephen King".

5. Despite the prominent use of plaintiff's name in connection with the film, the film cannot truthfully be said to be "based upon" plaintiff's short story. The film incorporates only one scene from the story and uses it in a manner fundamentally inconsistent with the essential plot, characters and theme of the short story. The scene from the short story, as used in the film, occupies approximately two minutes of time on the screen, and the rest of the film deals with material entirely unrelated to the short story. Plaintiff's short story is about a lazy, suburban husband who neglects his lawn after an unfortunate incident in which his old lawnmower, operated by a neighborhood boy who usually mows his lawn, mows over the neighbor's cat. After great delay in hiring someone to mow his lawn, the husband discovers that his regular lawnmower boy has gone off to college and he resorts to the yellow pages to find a lawnmower service. The service that he calls sends over an obese man in overalls who turns out to be an agent from the pagan god Pan. The lawnmower begins mowing the lawn on its own. The cleft-footed lawnmower man proceeds to take off all of his clothes and runs after the lawnmower on his hands and knees, eating grass, and swerving to eat a mole that the lawnmower runs over. The horrified homeowner calls the police, which provokes the all-knowing lawnmower man to have his lawnmower chase the man, and presumably run him over. The story ends with the police discovering the remains of the man in the birdbath. The story in its entirety is ten pages long. The movie is a full length feature film about "Virtual Reality", a highly advanced computer technology with the potential to alter and improve the human mind. The protagonist is a well-intentioned scientist whose technology advances beyond his control. The subject of the technological experiments is a good-hearted, simple-minded boy who happens to mow lawns. The climatic scene from the short story is inserted into the film in a manner wholly unrelated to the plot of the film, and key elements of the short story, such as the agent from Pan and the retribution on the lazy homeowner, are omitted from the film. Although the court will not summarize the myriad of differences between the film and the short story, suffice it to say that upon viewing the film, the typical movie-goer who has read plaintiff's story would be dismayed to see the film promoted as "based upon" plaintiff's work.

6. Plaintiff first learned of defendants' use of his name in connection with the film in October of 1991 when he read a synopsis in a professional journal describing his connection with a film about "Virtual Reality". Plaintiff, through his lawyer Jay Kramer, informed defendants that he did not want a possessory credit on October 9, 1991, and on October 21, 1991, and thereafter on February 28, 1992. (Pl.Exh. 5) Plaintiff's objections to the possessory credit gratuitously conferred on him by Allied were consistent and emphatic.

7. Thereafter, plaintiff made repeated efforts to actually view the film. Plaintiff first viewed the film in early March of 1992, a few days before its scheduled release to the general public.

8. The evidence discloses that defendants actually conspired in advance of the

film's general release to the public not to honor plaintiff's repeated requests to view the film and the credits. (Pl.Exh. 16) Both defendants ignored plaintiff's demands that his name not be used in such a way as to credit him with the authorship of the film. Plaintiff was not permitted to view the film or any theatrical versions of the film until March 3, 1992. Plaintiff filed this lawsuit on May 28, 1992, and then moved for a preliminary injunction on June 3, 1992. On June 10, 1992, plaintiff moved for a temporary restraining order.

9. Except for a few instances, defendants did not enter into any new deals with regard to the commercial exploitation of the film between March 3, 1992, when plaintiff viewed the film, and May 28, 1992, when plaintiff filed the present lawsuit.

10. The film was released to the general public on or about March 7, 1992, in the domestic market.

11. Defendants have made arrangements to distribute the film in several foreign countries. At present, the film is being shown abroad only in the United Kingdom and Australia. There are pending arrangements to show the film in other foreign countries beginning on July 23, 1992.

## III. CONCLUSIONS OF LAW

1. A party is entitled to preliminary injunctive relief when it can show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 78 (2d Cir.1990) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979)), *cert. denied*, —— U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991).

2. Irreparable harm is presumed where plaintiff has demonstrated a probability of success on a Lanham Act claim. *See Home Box Office, Inc. v. Showtime/Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987); *Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38 (2d Cir.1986); *Allen v. National Video, Inc.*, 610 F.Supp. 612, 630 (S.D.N.Y.1985).

3. Even absent any presumption arising from plaintiff's Lanham Act claim, plaintiff has nonetheless demonstrated irreparable harm. Where, as here, a creative work is misattributed to a prominent author or artist, reputational harm is inevitable and largely immeasurable. *See, e.g., Clifford Ross Co. v. Nelvana, Ltd.*, 710 F.Supp. 517 (S.D.N.Y.), *aff'd without op.*, 883 F.2d 1022 (2d Cir.1989); *Wojnarowicz v. Human Family Assn.*, 745 F.Supp. 130 (S.D.N.Y.1990); *Benson v. Paul Winley Record Sales Corp.*, 452 F.Supp. 516, 518 (S.D.N.Y.1978). Plaintiff need not demonstrate lost profits or tangible damage to his reputation to show irreparable harm. Plaintiff's fans who have read his story and go to see the film because of its association with plaintiff are likely to be annoyed and confused when they discover that the film is not actually based upon plaintiff's work. The public may well blame plaintiff for their disappointment and refrain from viewing future films claiming to be associated with him. Moreover, even if plaintiff sustains no measurable loss in profits, plaintiff's name and reputation are inevitably diluted by the misattribution to him of works which he did not create. The mere fact that an author remains widely popular and successful after a work which he did not create is misattributed to him does not negate a finding of irreparable harm. If it were otherwise, defendants would have a license to freely misappropriate the names of famous persons to promote the works of unknown artists, as long as the person whose name was appropriated remains largely successful. The law does not permit such calculated and deceptive practices.

4. Plaintiff has demonstrated a likelihood of success on the merits of his Lanham Act and common law unfair competition claims. New York common law of unfair competition is closely analogous to the law of unfair competition under the Lanham Act. *See, e.g., Spring Mills, Inc.*

*v. Ultracashmere House, Ltd.*, 532 F.Supp. 1203, 1211 n. 6 (S.D.N.Y.), *rev'd on other grounds*, 689 F.2d 1127 (2d Cir.1982); *Corning Glass Works v. Jeannette Glass Co.*, 308 F.Supp. 1321, 1327 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir.1970). Section 43(a) of the Lanham Act prohibits the use by "any person, in connection with any goods or services" of a "false designation of origin, or false description or representation," including "words or other symbols tending falsely to describe or represent the same...."

5. The use of a person's name in a manner which misidentifies that person as the author or creator of a particular work is encompassed by the prohibition in Section 43(a) of the Lanham Act. *See, e.g., PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120 (2d Cir.1984); *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14 (2d Cir.1976); *Follett v. New American Library, Inc.*, 497 F.Supp. 304 (S.D.N.Y. 1980).

6. Where an attribution of a work to a particular source is false on its face, there is no need to submit evidence of confusion by the public. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2d Cir.1987). In this case, defendants' prominent use of plaintiff's name in a possessory credit is false on its face, as plaintiff did not participate in, or contribute in any way to the making of the film, and did not even give his approval of the film at any point in the creative process. Plaintiff's involvement in the film is limited to writing a ten-page short story which is used as the basis for one minor scene in the film and which constitutes a tiny fraction of the movie. Under these circumstances, giving plaintiff a possessory credit in connection with the advertising and promotion of the film is false on its face and violates Section 43(a) of the Lanham Act and New York law of unfair competition.

7. Although the "based upon" credit affords more leeway in describing plaintiff's relationship to the film than the possessory credit, under these circumstances, the use of plaintiff's name in the "based upon" credit also violates the Lanham Act and New York law of unfair competition. The representation that the film is "based upon" plaintiff's short story grossly exaggerates any relationship between the film and plaintiff's short story, and is likely to mislead the public as to plaintiff's actual connection to the story depicted in the film.

8. The contract through which defendants obtained the motion picture rights to plaintiff's short story did not give defendants the right to use plaintiff's name in a possessory or "based upon" credit on a film that bears little or no relationship to plaintiff's work in its published form. The contract only requires plaintiff to receive screen credit where the film is based "wholly or substantially" on plaintiff's published work. The contract is silent on the question of whether defendants can use plaintiff's name in connection with a possessory or "based upon" credit where, as here, the film is not "wholly or substantially" based upon plaintiff's work. The contract therefore does not grant defendants the right to falsely misrepresent plaintiff's contribution to the film in violation of the Lanham Act. *See, e.g., Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 35 (2d Cir.1962) (the mere fact that a party possesses the right to create and sell altered versions of another's work does not insulate that party from liability if the public will be confused as to the source, sponsorship or approval of the altered goods).

9. Plaintiff has also demonstrated a likelihood of success on the merits of his claim under Section 51 of the New York Civil Rights Law, which provides in relevant part:

[a]ny person whose name ... is used within this state for advertising purposes ... without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name ... to prevent and restrain the use thereof; and may also sue and recover damages

for any injuries sustained by reason of such use....

Even where a party consents to the limited use of his name, the statute is violated where the limitation is exceeded. *See Dzurenko v. Jordache, Inc.*, 59 N.Y.2d 788, 464 N.Y.S.2d 730, 451 N.E.2d 477 (1983).

10. Plaintiff is also likely to succeed on the merits of his claim under New York General Business Law §§ 349, 350 and 368–d, which provide a private right of action for persons injured by deceptive acts or false advertising in the conduct of business. These provisions prohibit advertisements which are materially false and misleading and which appreciably affect the public. *See, e.g., Construction Technology v. Lockformer Co.*, 704 F.Supp. 1212, 1222–23 (S.D.N.Y.1989); *McDonald v. North Shore Yacht Sales, Inc.*, 134 Misc.2d 910, 513 N.Y.S.2d 590 (N.Y.Sup.Ct.1987); *Genesco Enterprises, Div. of Lymutt Indus. v. Koch*, 593 F.Supp. 743 (S.D.N.Y. 1984).

11. Plaintiff is not barred from obtaining an injunction by the defense of laches. "The party asserting laches must show that the opposing party 'did not assert her or their rights diligently, and that such asserted lack of diligence ... resulted in prejudice to them.'" *Steinberg v. Columbia Pictures Indus.*, 663 F.Supp. 706, 716 (S.D.N.Y.1987) (quoting *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 655 (2d Cir.1978)). Plaintiff's delay of two and a half months in filing suit does not rise to the level of laches. *See, e.g., Frito–Lay, Inc. v. Bachman Co.*, 659 F.Supp. 1129 (S.D.N.Y.1986) (four year delay did not bar action for injunction); *Underwriters Laboratories, Inc. v. United Laboratories, Inc.*, 203 U.S.P.Q. 180 (N.D.Ill.1978) (six month delay before plaintiff's writing of demand letter and bringing action did not rise to the level of laches).

12. Although delay not rising to the level of laches may nevertheless indicate the absence of irreparable harm and thus bar preliminary relief, *see Century Time, Ltd. v. Interchron, Ltd.*, 729 F.Supp. 366 (S.D.N.Y.1990), the court finds that under these circumstances, plaintiff's delay does not prevent him from obtaining a preliminary injunction. Plaintiff's two and a half month delay between the time he first viewed the film and the time he brought suit is not so significant as to bar preliminary relief. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir.1988) (six month delay in filing suit did not bar preliminary injunction). Defendants have failed to show that they were prejudiced by plaintiff's failure to file suit immediately after viewing the film, as virtually all of defendants' plans for commercial exploitation of the film were in place by March of 1992. Moreover, defendants were placed on notice as early as October of 1991 that plaintiff objected to the use of his name in a possessory credit, yet continued with their course of conduct. Reliance is not established where a defendant would have pursued the same course of conduct even if plaintiff had filed its suit earlier. *See Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1463 (Fed.Cir.1990). Most importantly, defendants actively prevented plaintiff from viewing the film until March of 1992, and intentionally used plaintiff's name in a misleading manner. A defendant who acts with wrongful intent is not entitled to benefit from the equitable defense of laches. *See, e.g., Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1098 (S.D.N.Y.1978), *aff'd without op.*, 607 F.2d 995 (2d Cir.1979); *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir.1981); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1334 (2d Cir.1975).

13. Similarly, defendants are not protected from a preliminary injunction by the defense of estoppel. Plaintiff repeatedly objected to defendants' use of his name in a possessory credit in connection with the film and defendants can show no detrimental reliance between the time plaintiff viewed the film and the time plaintiff filed this lawsuit. *See Steinberg v. Columbia Pictures Indus.*, 663 F.Supp. at 716.

14. The court has jurisdiction under the Lanham Act to enjoin the misuse of plaintiff's name in connection with the

foreign distribution of the film, as defendants' actions substantially interfere with United States commerce. *See, e.g., Steele v. Bulova Watch Co.,* 344 U.S. 280, 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952); *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 642 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76, *reh'g denied,* 352 U.S. 913, 77 S.Ct. 144, 1 L.Ed.2d 120 (1956); *A.T. Cross Co. v. Sunil Trading Corp.,* 467 F.Supp. 47, 50 (S.D.N.Y.1979); *Calvin Klein Indus. v. BFK Hong Kong, Ltd.,* 714 F.Supp. 78 (S.D.N.Y.1989); *Philip Morris, Inc. v. Mid-West Tobacco, Inc.,* 9 U.S.P.Q.2d 1210, 1213 (E.D.Va.1988). The ultimate inquiry is whether "the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction" under the Lanham Act. *American Rice, Inc. v. Arkansas Rice Growers Coop. Assn.,* 701 F.2d 408, 412 n. 5 (5th Cir.1983). Extraterritorial jurisdiction is appropriate in the present case because plaintiff has the exclusive right to his name throughout the world and his reputation will be irreparably harmed abroad by defendants' false representations in the foreign distribution of the film. Moreover, the false attribution occurred in the United States, and Allied contracted through its United States agent for the foreign distribution of the film.

The remainder of the trial is postponed until a later date, at which time the parties will have the opportunity to complete their case and the court will hear evidence on damages.

Plaintiff's request for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure is granted. Defendants, together with defendants' officers, agents, servants, employees, licensees, successors, assigns, and all other persons or entities in active concert or participation with defendants, directly or indirectly, will be enjoined, pending final determination of this action, from:

Utilizing plaintiff Stephen King's name on or in connection with the motion picture produced and distributed by defendants Allied and New Line, respectively, entitled "The Lawnmower Man" (the "Motion Picture"), foreign releases thereof, future releases thereof, sequels thereto, any television series purportedly based thereon, or any other work in film derived or purportedly derived therefrom, in any media, including but not limited to theatrical exhibition, television or in videocassette format for home use, or in connection with the advertising or promotion of the Motion Picture or any other work in film derived or purportedly derived therefrom, in any medium or format.