**A.V. BY VERSACE, INC., Plaintiff,**

v.

**GIANNI VERSACE, S.p.A. and Alfredo Versace, Defendants.**

and

**Gianni Versace, S.p.A., Third–Party Plaintiff,**

v.

**Anthony J. Pellegrino, Patrick Marano, Transportation Services, Inc., TSI Equipment, Inc., and John Does 1–10, Third–Party Defendants.**

**Gianni Versace, S.p.A., Plaintiff,**

v.

**Alfredo Versace and Foldom International (U.S.A.), Inc., Defendants.**

**Nos. 96 CIV. 9721PKLTHK, 98 CIV. 0123PKLTHK.**

United States District Court, S.D. New York.

Jan. 4, 2001.

Walsh & Walsh, Hackensack, NJ (John Walsh, of counsel), for A.V. By Versace, Inc.

Quirk and Bakalor, P.C., New York City (H. Nicholas Goodman, James M. Andriola, of counsel), for A.V. By Versace, Inc., Anthony J. Pellegrino, and Patrick Marano.

Phillips, Nizer, Benjamin, Krim & Ballon LLP, New York City (Theodore C. Max, David E. Jacoby, of counsel), for Gianni Versace, S.p.A.

Alfredo Versace, Lawrence, NY, pro se.

### OPINION AND ORDER

LEISURE, District Judge.

Gianni Versace, S.p.A. (hereinafter "Gianni") seeks an order, pursuant to Fed-eral Rule of Civil Procedure 60(a), to modify a preliminary injunction entered by the Honorable Sidney H. Stein, United States District Judge, in *Gianni Versace, S.p.A. v. Alfredo Versace and Foldom Int'l (U.S.A.), Inc.* (hereinafter the "*Foldom* Action"). For the following reasons, Gianni's motion to modify the preliminary injunction is dismissed as moot because the Court clarifies that the preliminary injunction entered by Judge Stein applies extraterritorially.

### BACKGROUND

Gianni is a world-famous design house founded in the 1970s by the late Italian designer, Mr. Gianni Versace. Gianni owns a number of famous trademarks incorporating the name "Versace," as well as its signature "Medusa" trademarks. A.V. By Versace, Inc. (hereinafter "A.V.") is a Texas corporation originally formed by Mr. Alfredo Versace (hereinafter "Mr. Versace"), Anthony Pellegrino, and Patrick Marano. A.V. is a manufacturer of clothing and athletic shoes bearing the trademarks "A.V. By Versace" and "Alfredo Versace," pursuant to an alleged license with Mr. Versace, an Italian citizen and United States resident alien.

### I. The *A.V.* Action

The factual background of this action has been set forth in greater detail in this Court's January 28, 1997, Memorandum Order, see *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 1997 WL 31247, at *1 (S.D.N.Y. Jan.28, 1997), familiarity with which the Court assumes. In December 1996, A.V. commenced an action (hereinafter the "*A.V.* Action") against both Gianni and Mr. Versace after its customer, Kinney Shoe Corporation, received a "cease and desist" letter from Gianni's attorneys alleging that Kinney's sales of "A.V. By Versace" and "Alfredo Versace" clothing and shoes infringed various Gianni trademarks. As to Gianni, A.V. sought (1) declaratory relief, declaring that its products do not infringe Gianni's registered

trademarks; (2) injunctive relief, enjoining Gianni from sending further "cease and desist" letters to A.V.'s customers; and (3) damages, under theories of unfair competition and tortious interference with contract. *See id.* Against Mr. Versace, A.V. requested (1) declaratory relief, ruling that (a) it has the sole right to use the mark "Alfredo Versace," and (b) if the mark is registered in the United States, it must be assigned the registration; and (2) compensatory and punitive damages. *See id.*

On January 28, 1997, this Court denied A.V.'s request for a preliminary injunction against the two defendants that would have prohibited both from using the mark "Alfredo Versace," based on A.V.'s failure to demonstrate a likelihood of irreparable harm. *See id.* at *2–*3. Gianni subsequently filed counterclaims, a cross-claim, and third-party claims of trademark infringement and unfair competition against A.V. and third-party defendants Anthony Pellegrino and Patrick Marano. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* No. 96 Civ. 9721, 1998 WL 832692, at *1 (S.D.N.Y. Dec.1, 1998).

## II. The *Foldom* Action and Judge Stein's Preliminary Injunction

On January 8, 1998, Gianni filed a separate lawsuit against Mr. Versace and Foldom International (U.S.A.), Inc. (hereinafter "Foldom"), alleging trademark infringement, unfair competition, and trademark dilution in violation of the Lanham Act, 15 U.S.C. §§ 1114($l$), 1125(a), and 1125(c); trademark dilution, pursuant to New York General Business Law § 360–$l$; and trademark infringement and unfair competition under New York common law. *See Foldom* Compl. ¶ 1. Gianni claimed that Mr. Versace and Foldom were manufacturing and selling products that infringed Gianni's registered trademarks, and/or licensing or franchising such infringing trademarks. *See id.* ¶ 17. These products allegedly included men's and women's suits, jeans, tee-shirts, sweaters, active wear, hand-

bags, leather goods, and packaging bearing the names "AV Versace," "Versace by A.V.," or "Alfredo Versace." *Id.* ¶ 18. By its complaint, Gianni sought a preliminary injunction enjoining Mr. Versace and Foldom from using "its trademarks or trade dress or any designation so similar as likely to cause confusion, mistake or deception," including "Alfredo Versace," "A.V. by Versace," "Versace by A.V." and "A. Versace." *Id.* ¶ A. In addition, Gianni sought compensatory and punitive damages. *See id.* ¶ C, E–G. The case was originally assigned to the Honorable Sidney H. Stein.

On February 4, 1998, Judge Stein granted Gianni's request for a preliminary injunction, issuing his decision from the bench. *See* Feb. 4, 1998 Conf. Tr. at 3–17. Judge Stein instructed Gianni to submit a proposed preliminary injunction to the Court by February 5, 2000, and to model its proposal after the injunction issued in *Gucci v. Gucci Shops, Inc.,* No. 83 Civ. 4453, 1988 WL 75263 (S.D.N.Y. July 13, 1988). *See id.* at 16–18. After Judge Stein issued the injunction, the parties sought clarification of a few issues. *See id.* at 19–32. First, counsel for Mr. Versace and Foldom asked Judge Stein if they could rely on the requirements of the *Gucci* preliminary injunction until he signed the preliminary injunction in the present case. *See id.* at 19. Judge Stein responded, "to the extent that [this order is] broader than the *Gucci* order, the answer is no." *Id.* Next, defense counsel raised the issue of the injunction's extraterritorial application. *See id.* at 21. Although never definitively ruling on the injunction's extraterritorial application at this hearing, Judge Stein made a few points clear regarding the injunction. First, Judge Stein recognized the Court's power to enjoin defendants' licensing and franchising activities abroad. *See id.* ("To the extent that [Mr. Versace] is directing things be done . . . I have jurisdiction to stop him from doing things."). Second, Judge Stein noted that, with regard to the injunction's

extraterritorial application, defendants had the burden to prove that their foreign activities were not subject to the injunction. *See id.* ("I think [Gianni's attorneys] are right [about the injunction applying to defendants' activities abroad.] I will let [defendant's attorneys] convince me otherwise."). Third, after further discussion, Judge Stein held that "[i]n the absence of [a clear holding from the Second Circuit], the proposed preliminary injunction should cover licensing in the States. For licenses to be entered abroad, let's see what the cases say." *Id.* at 24. Finally, Judge Stein directed the parties to submit applicable case law to him for a final determination of the injunction's extraterritorial application. *See id.*

Between February 4 and February 9, 1998, both parties submitted letter briefs and proposed orders arguing their respective positions on the issue of the Court's power to enjoin defendants' activities abroad. *See* Affidavit of Theodore C. Max., Esq., sworn to on May 23, 2000 (hereinafter "Max Aff."), ¶¶ 14–17 & Ex. C–F. On February 5, 1998, counsel for Gianni submitted a proposed preliminary injunction and cover letter which argued that the injunction should cover defendants' allegedly infringing conduct outside the United States. *See id.*, Ex. C. The following day, February 6, 1998, counsel for Mr. Versace and Foldom submitted a letter to Judge Stein detailing their proposed changes to the order submitted by Gianni. *See* Max. Aff. ¶ 16 & Ex. D. In this letter, defense counsel argued that the injunction should be limited to defendants' activities within the United States and therefore proposed adding the phrase "in the United States" three times in paragraph 12, once in paragraph 14, and once in paragraph 15. *See id.* Further, defense counsel contended that these changes were necessary "to clarify the issue that this order is not preventing our client from conducting businesses in foreign countries which may allow him to use his name or a variation thereof as a trademark." Letter from John F. Kaley, Esq.,

to the Court, dated Feb. 6, 1998, at 2 (Max.Aff., Ex. D). Each party filed additional objections to the other side's proposals over the next four days. *See* Max. Aff. ¶¶ 17–18 & Ex. E–G.

On February 10, 1998, Judge Stein signed the preliminary injunction. *See* Prelim. Inj., dated Feb. 10, 1998 (hereinafter "Prelim. Inj."). The injunction did not incorporate defendants' proposed additions of the phrase "in the United States," in paragraphs 12, 14, or 15. *See id.* The injunction did, however, refer to the United States in paragraph 8. *See* Prelim. Inj. ¶ 8. Paragraph 8 appears to be a verbatim adoption of the original proposal submitted by Gianni. *See* Proposed Prelim. Inj, attached as Ex. B to Theodore C. Max letter to the Court, dated Feb. 5, 1998. This paragraph—the subject of the present motion—states:

> [d]efendants, their officers, agents, servants, employees, representatives, licensees, and attorneys, and all persons in active concert or participation or privity with any of them who receive actual notice of this Order, are hereby enjoined, *pendente lite*, in the United States of America from registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing the use of any of the Versace Trademarks, Versace Trade Dress, or the Medusa Designs, as or as part of a trademark, service mark, business name, or trade name for any product, service, or business, or in such a manner as to create the impression that such name, logo or symbol is the trade name or business name of any designed, manufacturer, distributor, retailer or other business or trademark or service mark for any product or service . . . .

Prelim. Inj., ¶ 8. With the exception of paragraph 8, however, no other provision of the Order includes any geographic limitation. *See id.*; Max. Aff. ¶ 18.

In a letter dated March 25, 1998, counsel for defendants requested a conference

with Judge Stein to clarify the extraterritorial application of the preliminary injunction. *See* Letter from John F. Kaley, Esq. to the Court, dated Mar. 25, 1998, at 1–3. Defense counsel inquired specifically:

> Under the [preliminary injunction]; may Alfredo Versace sign a license agreement while present in his office in New York licensing a foreign entity or concern (*e.g.*, a Japanese or Korean company) to distribute goods bearing the trademark AV Versace or Alfredo Versace outside the United States, in, for example, a country where Alfredo Versace has rights to manufacture and distribute goods bearing either of those trademarks?

*Id.* at 2. Judge Stein denied defendants' request for clarification by Memorandum Endorsement on April 10, 1998. *See id.* at 1.

On July 30, 1998, Judge Stein stayed the *Foldom* Action, pending the resolution of the *A.V.* Action. *See A.V.*, 1998 WL 832692, at *1 (quoting Order of July 30, 1998, *Gianni Versace, S.p.A. v. Versace*, 98 Civ. 0123(SHS)).

### III. Consolidation and the Motion Before the Court

On December 1, 1998, this Court consolidated the *A.V.* Action with the *Foldom* Action, concluding that "[m]any common questions of both law and fact exists between the [two actions]." *A.V.*, 1998 WL 832692, at *2. The Court found that "[t]he complaint filed by [Gianni] in the *Foldom* Action seeks similar relief [to that of its cross-claim in the *A.V.* Action], overlapping substantially with the cross-claim." *Id.* In addition, the Court lifted the stay on the *Foldom* Action and granted Mr. Versace and Foldom twenty days to answer the *Foldom* complaint.[1] *See id.* at *3.

On May 23, 2000, Gianni brought the instant motion to modify the preliminary injunction entered by Judge Stein.

---

1. The stay did not affect the preliminary injunction. *See* Order dated July 30, 1998 (cit-

## DISCUSSION

### I. Clarification of Preliminary Injunction

Gianni contends that the preliminary injunction contains a typographical error due to an oversight on Judge Stein's behalf. *See* Max. Aff. ¶ 12. Specifically, Gianni asserts that Judge Stein's inclusion of the phrase "in the United States of America" in paragraph 8 of the preliminary injunction was unintentional. *See id.* Gianni attributes much of the blame for Judge Stein's oversight to its own counsel for including this phrase in the proposed preliminary injunction which its counsel submitted to Judge Stein on February 5, 1998. *See* id. ¶ 15. Gianni explains, however, that Judge Stein ordered Gianni's counsel to use the *Gucci* order as a template for its proposed preliminary injunction and provided less than one day for Gianni to weave the specifics of its own order into the Gucci template. *See id.* ¶ 13. The *Gucci* order, Gianni argues, is the ultimate source of the error, for the *Gucci* order included the geographical limitation "in the United States of America" in paragraphs 8, 15, and 18. *See* Pl. Mem. at 6. While Gianni's attorneys successfully removed the domestic limitation in paragraphs 15 and 18 of their proposed order, they failed to do so with paragraph 8. *See id.* Gianni claims that its own oversight was exacerbated when Judge Stein failed to remove the reference to "in the United States of America" from paragraph 8 of their proposed injunction, and instead adopted Gianni's proposed language verbatim. *See id.*

Gianni identifies two factors that militate in favor of finding that Judge Stein did not intend to include the domestic limitation in paragraph 8, and therefore intended the injunction to apply to defendants' activities abroad. First, Gianni insists that paragraph 8 is merely a general

---

ing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204 (2d Cir.1970)).

injunctive provision and that most of the conduct proscribed by paragraph 8 is specifically barred by other, more specific provisions of the injunction. *See* Max Aff. ¶ 5. Gianni bolsters this argument by pointing out that none of the other paragraphs of the injunction—paragraphs 9 and 10 (prohibiting Mr. Versace from using his name as a trademark and restricting the use of his name, other than to identify him as the designer of goods he actually designed), paragraph 12 (prohibiting defendants from attempting to register various marks and requiring that any pending application be withdrawn or abandoned), paragraph 13 (prohibiting Mr. Versace from delegating or licensing rights or obligations under the preliminary injunction, subject to limited exceptions), or paragraph 15 (ordering defendants to provide a copy of the Order to "all present and former licensees, franchisees, customers and distributors")—contains a geographic limitation or mentions "in the United States of America." *See id.* ¶¶ 5–12. This evidence, Gianni contends, demonstrates that Judge Stein intended the injunction to apply extraterritorially and that he merely erred when he included the domestic limitation in paragraph 8.

Second, Gianni argues that Judge Stein demonstrated his intent that the injunction apply to defendants' activities abroad when he failed to include defendants' proposed geographical limitations in the Order. *See id.* ¶ 17. It is Gianni's contention that if Judge Stein intended the injunction to be limited to defendants' activities in the United States, he would have accepted defendants' proposed addition of the phrase "in the United States" to paragraphs 12,

14, and 15. *See id.* Judge Stein's failure to do so, Gianni argues, indicates that the injunction applies extraterritorially. *See* Pl. Mem. at 7–8.

Mr. Versace,[2] now appearing *pro se*, argues that the Court should be "extremely skeptical" of Gianni's argument to modify the preliminary injunction in existence for more than two and a half years. Def.'s Mem. ¶ 2. He alleges that Gianni's argument is "disingenuous" and notes that the detailed letters presented to Judge Stein militate in favor of finding that Judge Stein intended for paragraph 8 to limit the injunction to domestic activities. *See id.* ¶¶ 2, 3. Finally, Mr. Versace contends that Gianni failed to meet its required burden for a modification of the injunction. *See id.* ¶ 6.

■ While Gianni's argument may well have merit, it is unnecessary to examine Rule 60(a) here because the Court clarifies that the injunction entered by Judge Stein applies extraterritorially. The Court makes this determination pursuant to its power to clarify orders previously issued by the Court. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15, 65 S.Ct. 478, 89 L.Ed. 661 (1945) (clarification of orders is within the sound discretion of the district court). The Supreme Court has encouraged clarification of court orders in order to facilitate compliance with the orders and to prevent "unwitting contempt" by the parties. *See id.* The Court of Appeals for the Second Circuit has explained that clarification of court orders may be obtained by motion or made sua sponte by the court. *See N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984). Here, although Gianni has brought

---

**2.** Foldom failed to file opposition papers to Gianni's motion, and instead informed the Court on November 2, 2000, that "the company is no longer conducting normal trade of business due to all partners have [sic] left the company and return overseas." *See* Letter from Peter Lam, Manager of Foldom International (U.S.A.), Inc., to the Court, dated Oct. 30, 2000. Mr. Lam also said that Foldom "will not be responsible for any future legal

action since the company is no longer in existence." *Id.* Subsequently, Gianni filed an Order to Show Cause For Default Judgment against Foldom, which this Court signed on November 30, 2000. Foldom failed to file answering papers and did not attend the show cause hearing pursuant to the Order to Show Cause. Accordingly, the Court entered a default judgment against Foldom on December 14, 2000.

a motion to modify the injunction pursuant to Rule 60(a), Gianni is essentially seeking clarification of the injunction's extraterritorial scope. Mr. Versace himself made a similar motion to clarify the scope of the injunction on March 25, 1998. *See* Letter from John F. Kaley, Esq. to the Court, dated Mar. 25, 1998, at 1–3. As discussed previously, however, Judge Stein failed to clarify the injunction at that time. *See id.* Therefore, this clarification provides the appropriate guidance to the parties regarding the scope of the injunction and obviates the need to determine whether Judge Stein committed a clerical error pursuant to Rule 60(a).

Furthermore, the Court highlighted the need to clarify the injunction in its March 6, 2000 Opinion and Order finding Mr. Versace in civil contempt for violating the preliminary injunction. *See A.V. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 282 (S.D.N.Y.2000). In that Order, the Court interpreted the injunction solely in the context of contempt sanctions. *See id.* Finding that the injunction was not sufficiently "clear and unambiguous" to meet the high standard for civil contempt sanctions regarding Mr. Versace's overseas activities, *see* id. at 291, the Court nevertheless found Mr. Versace in civil contempt for selling goods via the Internet in violation of the injunction. *See id.* at 294–95. Moreover, the Court recognized the need to clarify the injunction so that each of the parties could be apprised of their responsibilities and duties created by the injunction. The Court takes this opportunity to provide such clarity.

■ Several significant factors contribute to the Court's finding that the preliminary injunction applies extraterritorially. First, as Gianni points out, with the exception of paragraph 8, no other paragraph of the injunction contains any geographical limitation. Indeed, paragraphs 9 through 15 spell out the specific provisions which Mr. Versace and Foldom are subject to in great detail, yet they fail to limit these provisions to the United States. Thus, on their face, these paragraphs are not limited to domestic activity as Mr. Versace claims.

Second, and perhaps most importantly, Judge Stein rebuffed defendants' attempts to include the phrase "in the United States" in paragraphs 12, 14, and 15 of the injunction. This refusal is quite telling. Judge Stein was clearly aware of defendants' steadfast position that the injunction should be limited to domestic activity. Nonetheless, Judge Stein chose not to incorporate defendants' proposals to limit the injunction in this respect. This inaction, coupled with the fact that Judge Stein had placed the burden on defense counsel to convince him that the injunction should be limited to the United States, *see* Feb. 4, 1998, Conf. Tr. at 21, is tantamount to declaring that the injunction is not so limited. If Judge Stein had intended the injunction to be limited to the United States, then there is no conceivable explanation for why he would refuse to include defendants' suggested additions to the aforementioned paragraphs. Indeed, in light of Rule 65(d)'s express demand for specificity, *see* Fed.R.Civ.P. 65(d) ("Every order granting an injunction ... shall be specific in terms; shall describe in reasonable detail ... the act or acts sought to be restrained"), Judge Stein could not have simply been avoiding redundancy by refusing to add defendants' proposals if he truly intended the injunction to be limited to the United States. Therefore, Judge Stein's omission is essentially an affirmative statement manifesting his intent that the injunction should apply extraterritorially.

Third, the grammatical structure of paragraph 8 also suggests that the injunction is not limited to the United States. Paragraph 8, in relevant part, reads: "defendants ... are hereby enjoined, *pendente lite,* in the United States of America from registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing the use of any of the Versace trademarks ...." Prelim. Inj., ¶ 8. If "in the United

States of America" were intended to modify the specific provisions that follow it, surely this phrase would have *followed* the list of proscribed activities. The Supreme Court advanced such a structural reading in *United States v. Ron Pair Enters.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), where the Court found that a phrase separated from language that follows it by another word "stands independent of the language that follows." *Id.* at 241, 109 S.Ct. 1026. The Court found that such separation clearly demonstrated that the phrase preceding the separation did not modify the language that followed it. *See id.* Here, the Supreme Court's analysis leads to the conclusion that "in the United States" does not modify the restrictions that follow it. Rather, this language stands independent of those restrictions. Therefore, this paragraph cannot be read to indicate a domestic limitation of the injunction.

Finally, it is worth mentioning that, despite his present argument to the contrary, there is evidence that Mr. Versace himself construed the injunction to apply extraterritorially. In apparent compliance with paragraph 15 of the injunction, which required Mr. Versace to provide a copy of the injunction to "all present and former licensees, franchisees, customers and distributors," Mr. Versace sent a copy of the injunction to at least fifteen companies outside of the United States. *See* Affidavit of John F. Kaley, Esq., sworn to on Jan. 26, 1999, ¶ 2 & Ex. B; Affidavit of Alfredo Versace, sworn to on Jan. 27, 1999 (hereinafter "Alfredo Versace Aff."), ¶ 14 (attached as Ex. B to Max Aff.). Mr. Versace's willingness to send the requisite notice to these foreign companies, in light of Judge Stein's refusal to add a geographic limitation to paragraph 15, demonstrates inescapably that he originally interpreted the injunction to apply extraterritorially.

Therefore, after examining all the relevant evidence relating to the injunction, it is clear that the preliminary injunction applies to Mr. Versace's activities both in the United States and abroad.

## II. Extraterritorial Application of the Lanham Act

Although Judge Stein did not place his analysis of the extraterritorial application of the Lanham Act on the record, the Court will now do so. It is well-established that United States courts have jurisdiction to apply the Lanham Act to allegedly infringing conduct occurring outside the United States when necessary to prevent harm to United States commerce. *See, e.g., Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (affirming an injunction prohibiting a United States citizen from selling fake "Bulova" watches in Mexico because, *inter alia*, these sales adversely affected Bulova's reputation in the United States and abroad); *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993 (2d Cir. 1997) (enjoining a United States corporation from distributing infringing novelty items abroad and ordering the corporation to acquire all items located outside the United States and ship them to its warehouse in the U.S. for storage during the proceedings); *King v. Allied Vision, Ltd.*, 807 F.Supp. 300 (S.D.N.Y.), *aff'd in part and rev'd in part on other grounds*, 976 F.2d 824 (2d Cir.1992) (affirming an injunction barring both domestic and foreign release of a movie with a Steven King possessory credit). In *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), the Second Circuit articulated a three-part test for the application of the Lanham Act to extraterritorial conduct: (1) whether the defendant is a United States citizen; (2) whether a conflict exists between the defendant's trademark rights under foreign law and the plaintiff's rights under domestic law; and (3) whether the defendant's conduct has a substantial effect on United States commerce. *See id.* at 642 (denying extraterritorial application of the Lanham Act when defendant was not a U.S. citizen and a

conflict existed with foreign law). The Second Circuit has stated that "the absence of one of the above factors might well be determinative," and that the absence of two factors is "certainly fatal." *Id.* at 642–43; *see also Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824, 831 (2d Cir.1994) (observing that the absence of two factors—citizenship and a substantial effect on U.S. commerce—is "fatal to an argument that the conduct is governed by the Lanham Act"). In the absence of any Second Circuit precedent, it appears that "[n]one of these three criteria is dispositive of the analysis concerning the Lanham Act's extraterritorial effect, and a court must employ a balancing test of all three factors to determine whether the statute is properly implicated." *Warnaco Inc. v. VF Corp.,* 844 F.Supp. 940, 950 (S.D.N.Y. 1994). The Second Circuit recently highlighted, however, that it had "never applied the Lanham Act to extraterritorial conduct absent a substantial effect on United States commerce." *Atlantic Richfield Co. v. Arco Globus Int'l Co.,* 150 F.3d 189, 192 n. 4 (2d Cir.1998). The Court will examine each of the three *Vanity Fair* factors in turn.

### a. Citizenship of Defendants

■ The first factor, whether defendants are United States citizens, supports the extraterritorial application of the Lanham Act in this case. Defendant Foldom International (U.S.A.), Inc. is incorporated in the state of New York, *see* Foldom's Answer ¶ 6, and is therefore considered a U.S. citizen. Defendant Alfredo Versace has resided in and done business in the United States for over forty years, *see* Declaration of Alfredo Versace, dated Jan. 20, 1998 (hereinafter "Alfredo Versace Decl."), ¶ 4, but remains a citizen of Italy. *See* Alfredo Versace Aff., ¶ 7 & Ex. C. The record indicates that Mr. Versace is well aware that obtaining U.S. citizenship would ensure that his alleged infringing activity abroad would be subject to the Lanham Act. *See* Alfredo Versace Aff., ¶ 7. Mr. Versace's Italian citizenship, however, cannot serve as a shield against the application of the Lanham Act. Indeed, the Second Circuit has noted that foreign citizenship alone may not be sufficient to defeat extraterritorial application of the Lanham Act. *See Totalplan,* 14 F.3d at 830. Moreover, several courts in this district have refused to allow a resident alien's citizenship status to defeat the extraterritorial application of the Lanham Act. *See Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.,* 714 F.Supp. 78, 80 (S.D.N.Y. 1989) (Owen, J.); *A.T. Cross Co. v. Sunil Trading Corp.,* 467 F.Supp. 47, 50 n. 5 (S.D.N.Y.1979) (Duffy, J.); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir.1995) (applying the Lanham Act extraterritorially to non-citizen residents of the United States where co-defendants are U.S. corporations).

In *Calvin Klein,* the court found that the individual defendant, a United States resident alien, should be treated as a U.S. citizen for purposes of the Lanham Act because he was the controlling force behind the co-defendant, a New York corporation. *See Calvin Klein,* 714 F.Supp. at 80. Likewise, Mr. Versace should be deemed a constructive U.S. citizen here because the evidence indicates that he is the controlling force behind Foldom. Although he does not hold an official title at Foldom, it appears that Mr. Versace is a *de facto* officer of Foldom. Curiously, Foldom has never disclosed the names of its corporate officers with the exception of Paul Law, who in an affidavit states that he is the managing director of Foldom. *See* Affidavit of Paul Law, sworn to on January 27, 1999. In addition, Foldom has produced only 18 pages of documents in two and a half years of discovery and has completely ignored numerous Court orders to comply with discovery requests, which, *inter alia,* led the Court to issue a default judgment against them.

The evidence on the record, however, does indeed indicate that Mr. Versace is

the controlling force behind Foldom. First, Mr. Versace and Foldom share the same office address, phone number, and facsimile number. *See* Affidavit of Theodore C. Max, Esq., sworn to on Jan. 8, 1998 (hereinafter "First Max Aff."), Ex. N; *see also* Alfredo Versace Decl., Ex. Q, Doc. 00344. Second, Mr. Versace placed numerous orders for his allegedly infringing goods through Foldom. *See* Alfredo Versace Decl., Ex. Q, Docs. 00273, 00274, 00344, 00993, 01050, 01082, 01037. In total, Foldom has been named the importer of record for approximately $90,000 worth of Alfredo Versace goods. *See id.*, Ex. Q.

Third, there is evidence that Thomas Conrad, an employee of Mr. Versace, *see* Declaration of Thomas Conrad (hereinafter "Conrad Decl."), dated Jan. 12, 1998 (attached as unnumbered exhibit to Alfredo Versace Decl.), also held himself out to be an employee of Foldom. *See* First Max Aff., ¶ 23. Although Mr. Conrad denies this allegation, *see* Conrad Decl., other documentation clearly shows that Mr. Conrad placed and received business orders on Foldom's behalf. For example, Mr. Conrad signed for samples of "Alfredo Versace dresses" that Foldom purchased from the Fortune Tree Company, Inc. on different occasions. *See* Alfredo Versace Decl., Ex. Q, Docs. 00273, 00274. In addition, Foldom placed a large order for "Alfredo Versace" denim jeans on March 27, 1997, which explicitly states that the order was prepared by Tom Conrad. *See* Alfredo Versace Decl., Ex. Q, Doc. 00940.

Furthermore, an investigator of Gianni's, Eleftherios Mountagiannakis, ordered a sample of "AV Versace" jeans from Mr. Versace after viewing numerous samples of "Alfredo Versace" goods in Mr. Versace's New York showroom. *See* Declaration of Eleftherios Mountagiannakis, dated Jan. 6, 1998, ¶ 2. Mr. Mountagiannakis also met Mr. Conrad on his visit to Mr. Versace's showroom, and was assured over the next few weeks by Mr. Versace and Mr. Conrad, acting on behalf of Foldom, that they would provide him with the sample of jeans shortly. *See id.* at ¶ 3. The jeans were ultimately received by Mr. Mountagiannakis, along with a faxed receipt indicating that it was sent from Foldom. *See* Letter from Theodore C. Max, Esq., to Judge Stein, dated Apr. 20, 1998, Ex. C. Mr. Conrad's actions suggest that Mr. Versace's employees and Foldom's employees are in fact one and the same people. This co-mingling of employee duties, coupled with the shared facilities, also suggests that Foldom may have been an alter ego of Mr. Versace's, which Mr. Versace used to place orders for his infringing goods. At the very least, however, this evidence indicates that Mr. Versace repeatedly used Foldom to receive and send allegedly infringing goods. Therefore, Mr. Versace can be viewed as a controlling force behind Foldom akin to a *de facto* officer.

The evidence of Mr. Versace's interaction with Foldom, in conjunction with the fact that Mr. Versace has lived in the United States since 1949 and has owned businesses here since 1962, *see* Alfredo Versace Decl., ¶¶ 4, 10, strongly militates in favor of considering Mr. Versace a U.S. citizen for purposes of this motion. Moreover, permitting the Lanham Act's extraterritorial analysis to hinge on an alleged infringer's citizenship status would provide a safe haven for resident alien infringers. Therefore, this factor weighs in favor of the extraterritorial application of the Lanham Act.[3]

---

**3.** Even if Mr. Versace was not a controlling force behind Foldom such that he is deemed a constructive citizen, the preliminary injunction may still be applied extraterritorially. The Second Circuit has stated that citizenship alone may not be sufficient to defeat the extraterritorial application of the Lanham Act. *See Totalplan,* 14 F.3d at 830. Presumably, citizenship is not a dispositive factor because Congress has the power to apply the Lanham Act extraterritorially under the Commerce Clause. *See EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 252, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("Since the [Lanham] Act expressly stated that it applied to the extent of Congress' power over commerce, the Court in

### b. Conflict with Foreign Law

 The second factor, conflict with trademark rights under foreign law, also supports the extraterritorial application of the Lanham Act in this case. *Vanity Fair* established that "the Lanham Act ... should not be given an extraterritorial application against foreign citizens acting under presumably valid trade-marks in a foreign country." *Vanity Fair*, 234 F.2d at 643. The Second Circuit based this finding on "practical considerations such as the difficulty of obtaining extraterritorial enforcement of domestic law, as well as on considerations of international comity and respect for national integrity." *Id.* at 639. No such conflict with foreign law arises in this case. Although Mr. Versace alleges that he has valid trademark rights in unspecified foreign countries, he has not offered any concrete evidence of such rights.[4] Moreover, Gianni has documented its superior rights in various foreign jurisdictions, including actions in which it successfully opposed or canceled Mr. Versace's trademark applications in Italy, Germany, France, Switzerland, and Austria. *See* First Max Aff., ¶ 14 & Ex. F. Therefore, the evidence that no conflict with foreign law exists in this case weighs in favor of the extraterritorial application of the Lanham Act.[5]

### c. Substantial Effect on United States Commerce

 The final *Vanity Fair* factor, a substantial effect on U.S. commerce, clearly

supports the extraterritorial application of the Lanham Act in this case. The Lanham Act seeks both to protect American customers from confusion and to protect holders of American trademarks against misappropriation of their marks. *See Sterling Drug*, 14 F.3d at 746. To protect these dual goals, the Second Circuit has focused its analysis of this factor on two key areas: (1) likely U.S. customer confusion caused by the infringing goods, *see, e.g., Bulova*, 344 U.S. at 286–87, 73 S.Ct. 252; *Atlantic Richfield*, 150 F.3d at 192; *Sterling Drug*, 14 F.3d at 747; *Totalplan*, 14 F.3d at 830; and (2) the harm to the protected company's reputation, *see Bulova*, 344 U.S. at 286–87, 73 S.Ct. 252; *King*, 807 F.Supp. 300, 307 (S.D.N.Y.), *aff'd in part and rev'd in part on other grounds*, 976 F.2d 824 (2d Cir.1992).

 The Second Circuit's analysis stems from the *Bulova* case. In *Bulova*, the defendant, a United States citizen, sold fake "Bulova" watches in Mexico. *See Bulova*, 344 U.S. at 285, 73 S.Ct. 252. In time, the spurious "Bulova" watches filtered back into the United States and caused numerous complaints to the Bulova Watch Company's Texas sales representative. *See id.* In light of the defendant's taking "essential steps" in the course of the unlawful scheme in the U.S. and the adverse effect on Bulova's trade reputation, the Court found that the defendant's activities abroad were indeed subject to the Lanham Act. *See id.* at 286–87, 73

---

*Steele [v. Bulova Watch Co.]* concluded that Congress intended that the statute apply abroad."); *see also Vanity Fair*, 234 F.2d at 642 ("[I]t may well be that Congress could constitutionally provide infringement remedies so long as the defendant's use of the mark has a substantial effect on the foreign or interstate commerce of the United States.").

4. The only evidence that Mr. Versace has produced to date regarding his foreign rights is a document purporting to be a translation from the Commissioner of the Korean Industrial Property Office. *See* Alfredo Versace Aff., Ex. A. This document claims that Alfredo Versace has a registered trademark according to Ko-

rean Trademark Law, but does not specify what that trademark is nor provide any other information regarding its scope. Furthermore, Mr. Versace fails to provide the original Korean Trademark document, which would verify the authenticity of the translation. Therefore, the Court finds that this document is dubious authority for Mr. Versace's foreign rights.

5. If Mr. Versace subsequently proves that he possesses valid trademark rights in a foreign country, the Court would likely find that the preliminary injunction does not apply in that country.

S.Ct. 252. The Second Circuit recently confirmed that the combination of an infringing defendant's domestic activity coupled with consumer confusion or harm to the protected plaintiff's reputation and goodwill establishes a substantial effect on U.S. commerce. *See Atlantic Richfield*, 150 F.3d at 193.

Therefore, the Second Circuit has found that where the likelihood of consumer confusion or harm to a protected plaintiff's reputation is great, the substantial effect test has been satisfied. For example, in *Fun–Damental*, where a U.S. company sought to import infringing goods from a factory in China, the Court held that the substantial effect test had been met and the extraterritorial application of the Lanham Act was appropriate. *See Fun–Damental*, 111 F.3d at 1006 ("the importation of products ... clearly has substantial impact on United States commerce"); *see also Sterling Drug*, 14 F.3d at 747 ("If the [District] Court finds that defendant's use of the mark abroad carries such significant effects in the United States, the Court may require defendant to take appropriate precautions against using the mark ... in ways that might create confusion among United States consumers as to the source of defendant's products in the United States."). Similarly, in *King*, the Second Circuit affirmed the extraterritorial application of the Lanham Act to prohibit the misrepresentation of Stephen King's involvement with a film. See *King*, 807 F.Supp. 300, 307 (S.D.N.Y.) ("Extraterritorial jurisdiction is appropriate in the present case because plaintiff has the exclusive right to his name throughout the world and his reputation will be irreparably harmed abroad by defendants' false representations in the foreign distribution of the film."), *aff'd in part and rev'd in part on other grounds*, 976 F.2d 824 (2d Cir.1992).

Where the likelihood of consumer confusion or harm to a plaintiff's reputation is not serious, however, the Second Circuit has refused to permit the extraterritorial application of the Lanham Act. *See, e.g.,*

*Atlantic Richfield*, 150 F.3d at 192; *Totalplan*, 14 F.3d at 830. In *Atlantic Richfield*, for example, the allegedly infringing defendant never offered products for sale in the U.S., and only minimal "decision-making regarding [defendant's] foreign activities [took] place on American soil." *Atlantic Richfield*, 150 F.3d at 193. In addition, the Court found that there was no evidence that domestic consumers had been misled or that plaintiff's reputation was hurt as a result of defendant's foreign activities. *See id.* at 192. Therefore, the Court held that the Lanham Act did not apply to defendant's activities abroad. *See id.* at 193; *see also Totalplan*, 14 F.3d at 830 ("Unlike *Bulova*, there is no evidence that infringing goods have affected United States commerce by re-entering the country and causing confusion.").

In the instant case, defendants' activities clearly have a substantial effect on United States commerce. First, Gianni has presented evidence that Mr. Versace aggressively solicited purchasers of goods bearing the "AV Versace" mark from his showroom in New York City. *See* Affidavit of Eleftherios Mountogiannakis, sworn to on Nov. 25, 1997, ¶ 4. These goods include men's and women's jeans, men's sweaters, women's handbags, and wallets, all of which allegedly bore the "AV Versace" mark. *See id.* Second, there is undisputed evidence that Mr. Versace sent a pair of jeans bearing the "AV Versace" mark from Foldom's office in New York to an investigator of Gianni's in California. *See* Letter from Theodore C. Max, Esq. to Judge Stein, Apr. 20, 1998, at 3–4 & Ex. C. Moreover, there is undisputed evidence that Foldom has imported $90,000 worth (wholesale value) of goods for Mr. Versace from abroad. *See* Alfredo Versace Decl., Ex. Q. These goods range from 1,388 pairs of men's denim jeans with an estimated wholesale value of $35,000, to 1,602 men's shorts worth more than $32,000. *See id.,* Docs. 01050, 01082. In one case, it appears that Foldom even sold a shipment of Mr. Versace's men's jean shorts to another

company, Vero Accessories, Inc., which bears the same address as both Mr. Versace and Foldom. *See id.*, Docs. 01082, 01085.

Under *Fun–Damental*, the importation of allegedly infringing goods alone satisfies the substantial effect factor. *See Fun–Damental*, 111 F.3d at 1006. Here, however, the evidence demonstrates alleged importation, as well as sales within the U.S. and likely consumer confusion. Gianni has established credible evidence of likely consumer confusion through the United States Patent and Trademark Office (hereinafter "USPTO") applications of Mr. Versace. *See* First Max Aff., Ex. C, D. On August 26, 1992, the USPTO rejected Mr. Versace's application to register the "A. Versace Boutique" name. *See id*, Ex. C. The USPTO found that "[t]he applicant's and the registrant's marks are highly similar because they all contain the dominant, distinctive term Versace. The additional wording and lettering does not change the sound, connotation, or commercial impression of the dominant portion of the marks." *Id.* The USPTO further recognized the similarity of Mr. Versace's goods and those of Gianni, and concluded that "purchasers would be likely to mistakenly believe that the goods emanate from a common source or are somehow associated with the same producer." *Id.* Mr. Versace was equally unsuccessful in attempts to register his own name as a mark. *See id.*, Ex. D. The likelihood of consumer confusion is further bolstered by Gianni's success in canceling or opposing the trademarks "AV Versace" and "Alfredo Versace" in jurisdictions throughout the world, including Italy, Germany, France, Switzerland, and Austria. *See id.*, Ex. F.

Finally, unlike *Atlantic Richfield*, where the Second Circuit was concerned that only minimal decision-making regarding the defendant's foreign activities had taken place in the United States, *see Atlantic Richfield*, 150 F.3d at 193, Mr. Versace appears to conduct the vast majority of his foreign activities from his New York office and showroom. Indeed, neither Mr. Versace nor Foldom has presented any evidence that they maintain any foreign offices. Rather, when Mr. Versace applies for trademarks in foreign jurisdictions, he provides his New York office address as his return address. *See, e.g.*, First Max Aff., Ex. F; Alfredo Versace Aff., Ex. E. It thus appears that one of Gianni's attorneys properly characterized Mr. Versace's business operations when he remarked that "the spider at the middle of the web" is located in New York. *See* Feb. 4, 1998 Conf. Tr. at 21. In sum, defendants' reliance on foreign imports to further their alleged infringing scheme, defendants' orchestration of their foreign activities from the United States, and the high probability of consumer confusion both in the U.S. and abroad clearly establish a substantial effect on U.S. commerce.

Accordingly, each of the three *Vanity Fair* factors supports the exercise of extraterritorial application of the Lanham Act in this case.

## CONCLUSION

For the foregoing reasons, Gianni's motion to modify the preliminary injunction is HEREBY DISMISSED AS MOOT. However, the Court clarifies that the preliminary injunction entered by Judge Stein applies to Mr. Versace's activities abroad. The parties are ordered to appear before this Court at the United States Courthouse, 500 Pearl Street, Courtroom 18B, New York, New York, on Monday, January 29, 2001, at 10:00 a.m. for a pre-trial conference.

**SO ORDERED.**